# **EXHIBIT A**

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

WESTERN DIVISION

| | |
|---|---|
| DAWAUN LUCAS, et al., individually and on behalf of all others similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>SMILEDIRECTCLUB, INC. and SMILEDIRECTCLUB, LLC,<br><br>Defendants. | Case No. 2:20-cv-06059-VAP-E<br><br>**DECLARATION OF JUSTIN SKINNER IN SUPPORT OF MOTION TO COMPEL ARBITRATION OF PLAINTIFFS' INDIVIDUAL CLAIMS AND STAY THE CASE**<br><br>Judge: Honorable Virginia A. Phillips |

I, Justin Skinner, declare, under penalty of perjury, that I am of legal age and sound mind and, based upon personal knowledge, due investigation and review of records kept in the ordinary course of business, that the following facts are true and correct.

1. I am the Chief Technology Officer at SmileDirectClub, LLC ("SDC, LLC"). I have held this position since December 2018.

2. I have reviewed and am familiar with the Complaint in the action entitled *Lucas, et al. v. SmileDirectClub, Inc., et al.*, No. 2:20-cv-06059 (the "Complaint").

3. In my position as CTO, I have personal knowledge of the SmileDirectClub account creation process and the data reflecting the account creation and history of the plaintiffs identified in the Complaint: Dawaun Lucas, David Dominguez Hooper, Mete Tasin and Reejaunte Smith.

4. I have reviewed each Plaintiff's file and have provided below the information and screenshots derived from code and data maintained in the regular course of business. The screenshots identified below are true and accurate representations of the online registration process and were obtained at my direction from SDC, LLC's internal databases.

## I. The Account Creation Process

5. A consumer must first go through SDC, LLC's registration process before they can become a SmileDirectClub customer and take advantage of SDC, LLC's clear aligner therapy services.

6. To begin the registration process, they must first create a SmileDirectClub account with SDC, LLC.

7. Customers can create an account directly through the SmileDirectClub website (at www.smiledirectclub.com) or during an in-person visit to a SmileShop location where they are required to complete the same online process

8. During the online registration process at the time Plaintiffs Lucas and Tasin registered, customers were presented with the following screen:

> **JUST ONE MORE THING**
> **Thanks For Booking a Visit!**
>
> Now, you can finish setting up your account by creating a password and entering your date of birth below. This way, we have all your information before you show up.
>
> PASSWORD
>
> CONFIRM PASSWORD
>
> ● This order is for me
> ○ This order is for somebody else
>
> Date of Birth
> MM  DD  YYYY
>
> ☐ I agree to SmileDirectClub's Informed Consent and Terms & SmilePay Conditions
>
> How did you hear about us?
> PLEASE SELECT
>
> **FINISH MY ACCOUNT**

9. Customers--including Plaintiffs Lucas and Tasin--were required to check affirmatively the checkbox to agree to the Informed Consent Agreement. An image of the checkbox from the registration page is below for reference:

> ☐ I agree to SmileDirectClub's Informed Consent and Terms & SmilePay Conditions

10. During the online registration process at the time Plaintiffs Hooper and Smith registered, the screen presented to customers was materially identical. However, as a result of a technical issue, the checkbox presented to Plaintiffs Hooper and Smith may have been pre-checked by default.

11. There was one additional minor variation in the above language that was in effect at the time Plaintiff Smith registered. Specifically, the language next to the checkbox (pictured in Paragraph 8, above) read "<u>Informed Consent</u> and <u>Terms of Use</u>" instead of "<u>Informed Consent</u> and <u>Terms</u> & <u>SmilePay Conditions</u>."

12. To proceed with the account creation, the box next to the Informed Consent Agreement link must either have been checked or left checked.

13. The Informed Consent Agreement is presented to users as a hyperlink that, when clicked, takes the user to another screen that displays the full text of the agreement. Customers have the option to read, review and even print the agreement before checking or leaving checked the box.

14. A true and correct copy of the Informed Consent Agreement in effect at the time that Plaintiffs Lucas registered is attached hereto as Exhibit 1. The section entitled "Agreement to Arbitrate" is on Page 5.

15. A true and correct copy of the Informed Consent Agreement in effect at the time that Plaintiff Tasin registered is attached hereto as Exhibit 2. The section entitled "Agreement to Arbitrate" is on Page 5.

16. A true and correct copy of the Informed Consent Agreement in effect at the time that Plaintiffs Hooper registered is attached hereto as Exhibit 3. The section entitled "Agreement to Arbitrate" is on Page 3.

17. A true and correct copy of the Informed Consent Agreement in effect at the time that Plaintiff Smith registered is attached hereto as Exhibit 4. The section entitled "Agreement to Arbitrate" is on Page 3.

18. After filling out the registration screen, each Plaintiff had to then select "Finish My Account" to proceed with and conclude the registration.

## II. Plaintiffs' Respective Accounts, Orders and Text Messages.

19. On November 14, 2019 Plaintiff Lucas created a SmileDirectClub account online and scheduled an appointment at a retail location, known as a SmileShop.

20. On June 19, 2018, Plaintiff Hooper created a SmileDirectClub account online and scheduled an appointment at a SmileShop.

21. On December 7, 2019, Plaintiff Tasin created a SmileDirectClub account and scheduled an appointment at a SmileShop. At the same time, Plaintiff Tasin also ordered a

doctor-prescribed impression evaluation measurement kit to have his viability for clear aligner therapy treatment evaluated by a dentist or orthodontist, rather than going into a SmileShop. The kit was sent to him, but he attended his appointment instead.

22. On January 14, 2018, Plaintiff Smith created a SmileDirectClub account online and scheduled an appointment at a SmileShop.

23. SDC, LLC maintains an electronic file for each customer, including each customers' assent to the Informed Consent Agreement upon clicking "Finish My Account." These electronic files are maintained in UTC time (Coordinated Universal Time), which is 7 hours ahead of Pacific Time.

24. Plaintiff Lucas checked the box to the above-mentioned terms and clicked "Finish My Account" on November 14, 2019 at 7:24PM, UTC.

25. Plaintiff Tasin checked the box to agree to the above terms and clicked "Finish My Account" on December 7, 2019 at 2:03AM, UTC.

26. Plaintiff Hooper checked or left checked the box and agreed to the above terms and clicked "Finish My Account" on June 19, 2018 at 3:09AM, UTC.

27. Plaintiff Smith checked or left checked the box to agree to the above terms and clicked "Finish My Account" on January 14, 2018 at 2:00AM, UTC.

28. On June 20, 2018, November 21, 2019 and December 9, 2019, respectively, Plaintiffs Hooper, Lucas and Tasin visited local SmileShop locations, where they provided further information about their dental histories and chief complaints and learned about the teledentistry platform that SDC, LLC enables for the provision of clear aligner therapy by state licensed dentists and orthodontists to their patients.

29. Plaintiffs Hooper's, Lucas's and Tasin's information and draft treatment plans were sent to a dentist or orthodontist licensed to practice dentistry in the state of their residence for assessment, diagnosis and, if appropriate, treatment. Their aligner treatment plans were thereafter approved by their respective treating dentist or orthodontist whose

affiliated professional dental corporation had engaged SDC, LLC to use its dental support organization services and teledentistry platform.

30. Plaintiff Lucas's aligner treatment plan was approved by his treating dentist or orthodontist on November 22, 2019, Plaintiff Hooper's plan was approved by his treating dentist or orthodontist on June 20, 2018 and Plaintiff Tasin's plan was approved by his treating dentist or orthodontist on December 13, 2019.

31. Plaintiff Smith scheduled an appointment at a SmileShop for January 6, 2018, but on January 14, 2018 instead requested a doctor-prescribed impression evaluation measurement kit to have his viability for treatment evaluated by a dentist or orthodontist, rather than going into a SmileShop location. The kit was sent to him on or about January 15, 2018.

32. Plaintiffs Hooper, Lucas and Tasin did not complete the payment process for their treatment plans to finalize their orders receive their aligners. Accordingly, they were each sent text messages by SDC, LLC concerning their orders (*i.e.*, their Smile Plans, which are SmileDirectClub's dentist or orthodontist-approved treatment plans, which are customized treatment plans that have been reviewed and approved by the dentist or orthodontist who is responsible for overseeing their diagnosis and treatment), existing appointments, completing their aligner purchases and booking new appointments when their Smile Plans expired without completing the order.

33. Smile Plans reflect dentist or orthodontist-approved treatment based on a specific dental scan or impression, are only valid for 6 months, after which a new scan or impression would need to be conducted in order for a dentist or orthodontist to approve a more updated treatment plan.

34. Plaintiff Lucas was sent text messages pertaining to (i) his appointment and completing his scan, (ii) the status of his treatment plan, (iv) his Smile Plan and completing his purchase and (iii) booking a new appointment following the expiration of his Smile Plan.

35. Plaintiff Hooper was sent text messages pertaining to (i) his appointment, (ii) his Smile Plan and completing his purchase and (iii) booking a new appointment following the expiration of his Smile Plan.

36. Plaintiff Tasin was sent text messages pertaining to (i) his appointment and completing his scan, (ii) his impression kit order, (iii) the status of his treatment plan, (iv) his Smile Plan and completing his purchase and (iii) booking a new appointment following the expiration of his Smile Plan.

37. Because Plaintiff Smith did not return the impression kit, SDC, LLC sent text messages regarding scheduling an appointment so that photographs could be obtained to create a 3D image of his teeth and gums for subsequent review by the dentist or orthodontist who would be overseeing his diagnosis and possible treatment.

38. If Plaintiffs did not open their accounts and seek out and initiate the evaluation for and potential purchase of their clear aligner therapy, they would never have received text messages concerning their appointments, Smile Plans, orders, impressions and booking new appointments.

I declare under penalty of perjury pursuant to 28 U.S.C. § 1746 that the foregoing is true and correct.

Dated: September 8, 2020

JUSTIN SKINNER